AO 243 (Rev. 01/15)

MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT
SENTENCE BY A PERSON IN FEDERAL CUSTODY

Page 2

| United States District Court | | |
|---|---|---|
| Name *(under which you were convicted)*: Peter Bright | District   Southern District of New York | |
| Place of Confinement: FCC Petersburg | Docket or Case No.: 19 Cr. 521 PKC | |
| UNITED STATES OF AMERICA | Prisoner No.: 76309-054 | |
| V.   Peter Bright | Movant *(include name under which convicted)* Peter Bright | |

## MOTION

1.  (a) Name and location of court which entered the judgment of conviction you are challenging:

    P. Kevin Castel, Southern District of New York

    (b) Criminal docket or case number (if you know):   19 Cr. 521 PKC

2.  (a) Date of the judgment of conviction (if you know):   2019-11

    (b) Date of sentencing:   2019-11

3.  Length of sentence:   144 months

4.  Nature of crime (all counts):

    Attempted enticement of a minor, § 2422(b)

5.  (a) What was your plea?  (Check one)

    (1) Not guilty  [X]        (2) Guilty  [ ]        (3) Nolo contendere (no contest)  [ ]

    (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or what did you plead guilty to and what did you plead not guilty to?

6.  If you went to trial, what kind of trial did you have?  (Check one)     Jury [X]     Judge only [ ]

7.  Did you testify at a pretrial hearing, trial, or post-trial hearing?     Yes [X]     No [ ]

8.  Did you appeal from the judgment of conviction?     Yes [X]     No [ ]

AO 243 (Rev. 01/15)

9.   If you did appeal, answer the following:

(a)  Name of court:                Second Circuit Court of Appeals

(b)  Docket or case number (if you know):

(c)  Result:       Judgement affirmed

(d)  Date of result (if you know):        Decision became final on 2022-06-08

(e)  Citation to the case (if you know):

(f)  Grounds raised:

Abuse of discretion re: limits on expert testimony, inclusion
of 404(b) evidence, inadequate voir dire

(g)  Did you file a petition for certiorari in the United States Supreme Court?      Yes ☐      No ☒

If "Yes," answer the following:

(1) Docket or case number (if you know):

(2) Result:

(3) Date of result (if you know):

(4) Citation to the case (if you know):

(5) Grounds raised:

10.   Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications, concerning this judgment of conviction in any court?

Yes ☐    No ☒

11.   If your answer to Question 10 was "Yes," give the following information:

(a)  (1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4)  Nature of the proceeding:

(5)  Grounds raised:

AO 243 (Rev. 01/15)

(6)   Did you receive a hearing where evidence was given on your motion, petition, or application?

   Yes ☐      No ☐

(7)   Result: _____

(8)   Date of result (if you know): _____

(b)  If you filed any second motion, petition, or application, give the same information:

   (1)   Name of court: _____

   (2)   Docket of case number (if you know): _____

   (3)   Date of filing (if you know): _____

   (4)   Nature of the proceeding: _____

   (5)   Grounds raised: _____

(6)   Did you receive a hearing where evidence was given on your motion, petition, or application?

   Yes ☐      No ☐

(7)   Result: _____

(8)   Date of result (if you know): _____

(c)  Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

   (1)   First petition:      Yes ☐      No ☐

   (2)   Second petition:     Yes ☐      No ☐

(d)  If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

12.   For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States.  Attach additional pages if you have more than four grounds.  State the facts supporting each ground.

AO 243 (Rev. 01/15)

**GROUND ONE:** _Deprivation of a fair trial due to COVID-19 pandemic_

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

See facts set out in Memorandum Brief in Support of Motion to Vacate, Set
Aside, or Correct Sentence, and attached Declaration, to be filed contemporaneously

(b)  **Direct Appeal of Ground One:**

(1)  If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐       No ☒

(2)  If you did not raise this issue in your direct appeal, explain why:

The record was insufficiently developed to permit a direct appeal

(c)  **Post-Conviction Proceedings:**

(1)  Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐       No ☒

(2)  If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3)  Did you receive a hearing on your motion, petition, or application?

Yes ☐       No ☐

(4)  Did you appeal from the denial of your motion, petition, or application?

Yes ☐       No ☐

(5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐       No ☐

AO 243 (Rev. 01/15)

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):

_____

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

_____

**GROUND TWO:**   Ineffective assistance of counsel during trial

_____

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

See facts set out in Memorandum Brief, as above.

(b)  **Direct Appeal of Ground Two:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?

Yes [ ]       No [X]

(2)   If you did not raise this issue in your direct appeal, explain why:

Ineffective assistance claims need not be raised on direct appeal

(c)  **Post-Conviction Proceedings:**

(1)   Did you raise this issue in any post-conviction motion, petition, or application?

Yes [ ]       No [x]

AO 243 (Rev. 01/15)

(2)   If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3)   Did you receive a hearing on your motion, petition, or application?
Yes ☐      No ☐

(4)   Did you appeal from the denial of your motion, petition, or application?
Yes ☐      No ☐

(5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?
Yes ☐      No ☐

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND THREE:**      Ineffective assistance of counsel in post-trial motions

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

See facts set out in Memorandum Brief, as above.

AO 243 (Rev. 01/15)

(b) **Direct Appeal of Ground Three:**

    (1)  If you appealed from the judgment of conviction, did you raise this issue?

          Yes ☐    No ☒

    (2)  If you did not raise this issue in your direct appeal, explain why:

Ineffective assistance claims need not be raised on direct appeal

(c) **Post-Conviction Proceedings:**

    (1)  Did you raise this issue in any post-conviction motion, petition, or application?

          Yes ☐    No ☐

    (2)  If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

    (3)  Did you receive a hearing on your motion, petition, or application?

          Yes ☐    No ☐

    (4)  Did you appeal from the denial of your motion, petition, or application?

          Yes ☐    No ☐

    (5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

          Yes ☐    No ☐

    (6)  If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

GROUND FOUR: _____

(a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

(b)  **Direct Appeal of Ground Four:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?
Yes ☐       No ☐

(2)   If you did not raise this issue in your direct appeal, explain why:

(c)  **Post-Conviction Proceedings:**

(1)   Did you raise this issue in any post-conviction motion, petition, or application?
Yes ☐       No ☐

(2)   If you answer to Question (c)(1) is "Yes," state:
Type of motion or petition: _____
Name and location of the court where the motion or petition was filed:

Docket or case number (if you know): _____
Date of the court's decision: _____
Result (attach a copy of the court's opinion or order, if available):

AO 243 (Rev. 01/15)

(3)   Did you receive a hearing on your motion, petition, or application?

Yes ☐        No ☐

(4)   Did you appeal from the denial of your motion, petition, or application?

Yes ☐        No ☐

(5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐        No ☐

(6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

13.   Is there any ground in this motion that you have <u>not</u> previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

The impact of COVID-19 was not raised due to an insufficient record. The ineffective assistance claims were not raised because it is not required to raise them in direct appeal, and 2255 proceedings are more appropriate.

14.   Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the you are challenging?      Yes ☐        No ☒

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

AO 243 (Rev. 01/15)

15. Give the name and address, if known, of each attorney who represented you in the following stages of the you are challenging:

(a) At the preliminary hearing:

_____

(b) At the arraignment and plea:

_____Amy Gallicchio, Federal Defenders of New York_____

(c) At the trial:

_____Amy Gallicchio, Federal Defenders of New York_____

(d) At sentencing:

_____Amy Gallicchio, Federal Defenders of New York_____

(e) On appeal:

_____Daniel Habib, Federal Defenders of New York_____

(f) In any post-conviction proceeding:

_____

(g) On appeal from any ruling against you in a post-conviction proceeding:

_____

16. Were you sentenced on more than one court of an indictment, or on more than one indictment, in the same court and at the same time?          Yes ☐          No ☒

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?          Yes ☐          No ☒

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

_____

(b) Give the date the other sentence was imposed: _____

(c) Give the length of the other sentence: _____

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?          Yes ☐          No ☐

18. TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

A one-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of –

(1)  the date on which the judgment of conviction became final;

(2)  the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

(3)  the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4)  the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

AO 243 (Rev. 01/15)

Therefore, movant asks that the Court grant the following relief:

Vacatur of conviction, judgement of acquittal, new trial, appointment of counsel
or any other relief to which movant may be entitled.

_____
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion
under 28 U.S.C. § 2255 was placed in the prison mailing system on   September 22, 2022
                                                                    (month, date, year)

Executed (signed) on   September 20, 2022              (date)


_____
Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

United States versus Peter Bright

19 Cr. 521 PKC

Memorandum Brief In Support Of Motion To Vacate, Set Aside, or Correct Sentence

The motion and this brief are both being filed pro se. The limitations of my confinement mean that I do not have access to any modern word processing software, and instead must use an electric typewriter. While every effort has been made to ensure correct spelling, punctuation, and grammar, I am sure that some mistakes have slipped through. I apologize for these, and hope that they do not result in any ambiguity or lack of clarity.

To the extent that there are any legal deficiencies within this Brief, I hope that the Court will afford opportunity to correct them. Should I obtain counsel at some point, I hope that the Court will allow me to amend the motion and brief and, if necessary, raise new grounds.

1

DECLARATION OF PETER BRIGHT

I, Peter Bright, being competent to make this declaration and having personal
knowledge of the matters stated herin, declare pursuant to 28 U.S.C. § 1746:
I am the same Peter Bright who was the defendent in United States versus Peter
Bright, and who is the movant in the proceeding under 28 U.S.C. § 2255 which
is being instituted by the motion this declaration supports.


I was represented in the district court by Amy Gallicchio, Federal Defenders
of New York.
I first met Gallicchio on May 23rd, 2019, when she was appointed by the court
subsequent to my arrest and detainment on suspcion of violating 18 U.S.C.
§ 2422(b). I was held at the New York MCC facility ("MCC"), which is where
all meetings with Gallicchio took place after our initial meeting on the day
of my arraignment.
We met several times in the months leading up to my first and second trials,
in Febrary and March 2020. My ability to conduct any indepdent legal research
was severely hampered by my housi.ng at MCC; although MCC offered access to
Lexis Nexis, the nature of my charge meant that I could not safely use this
facility. There is little privacy available at MCC, and the law library computers
are in highly visible locations. Inmates routinely read over the shoulders
of those using the computers, and are constantly on the lookout for those
accused of sex crimes. Suspected sex offenders are routinely victimized and
attacked. As such, I was wholly dependent on Gallicchio for any and all legal
advice and information.
I was aware, superficially, of the existence of the entrapment defence, and
knew that it was classified as an affirmative defence. However, I misunderstood
the meaning of this label. I belived that to use an  affirmative defence I
would have to take the stand and affirmatively state that I committed the

crime that I was accused of, and that I only did so because of the government's inducement.

On a couple of occasions, Gallicchio commented to me that the case looked awfully close to being entrapment. I told her that although the government was wholly responsible for any plan to harm children, I could not make a claim of entrapment, because I was neither willing nor able to affirm the crime on the stand. I explained that this was for two reasons: first, that I was factually innocent, and hence unwilling to commit perjury, and, second, that the entrapment claim would be refuted because I had already truthfully disclosed to the FBI my intentions after my arrest. I thought that entrapment was an either/or proposition: either I could argue entrapment, or I could make my alibi defence, but I could not do both, and since I was already committed to the alibi defence, entrapment was not an option.

Accordingly, we did not make an entrapment argument during my trials, nor did we demand that the juries be given entrapment instructions.

It was not until I was transferred to FCC Petersburg that I learned that my understanding of the entrapment defence was flawed. Petersburg is a facility that houses a significant number of sex offenders, and as such they are not subject to the same level of victimization and harm as is otherwise commonplace throughout the Bureau of Prisons. One consequence of this is that sex offenders can use the law library facility safely, without fear of retribution.

I have used this facility to perform the kind of research on my case that I would have performed at MCC had it been safe for me to do so. In this research, I have learned that an affirmative defence is merely one that does not dispute any elements of the crime. It does not require a defendant to positively affirm that they committed the crime. Further, I learned that an entrapment instruction can be given to the jury, and an entrapment argument made by the defence attorney, even in cases where an alibi or other defence is made.

3

Moreover, I learned these things after only cursory investigation; it took no more than a couple of hours of using the law library to discover my errors. Gallicchio never explained these essential factors to me. I made my faulty understanding of the entrapment defence explicitly clear in my discussions with Ms Gallicchio, and specifically explained my unwillingness to affirm the crime and the apparent incompatibility of entrapment with my statement to the FBI. At no time did Gallicchio explain to me that the entrapment defence was nonetheless available to me; she never explained that I would not have to testify to affirm the elements of the crime, or that it was compatible with offering an alibi defence.

Had the true nature of the entrapment defence been explained to me then I would have demanded that the jury be given an entrapment instruction, and, further, have instructed Gallicchio to explain entrapment in argument. By allowing my clearly stated misapprehension to continue uncorrected, Gallicchio deprived me of a viable defence strategy.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of August 2022 in Petersburg, VA.

Peter Bright

## INTRODUCTION

After two jury trials, Mr Bright was convicted of attempted enticement of
a minor. The first trial resulted in a mistrial with the jury unable to reach
a unanimous verdict. The second jury reached a verdict, but it was unacceptably
influenced by the COVID-19 health emergency, rendering its decision unsafe.
Moreover, Mr Bright was prejudiced by the ineffective assistance of his trial
counsel, Amy Gallicchio.

## BACKGROUND

### I.  Procedural History

Caught up in an FBI sting operation, Mr Bright was arrested on May 22, 2019,
and charged with attempting to violate 18 U.S.C. § 2422(b), which outlaws
the enticement of minors to perform any sexual activity that can be charged
as a crime. Mr Bright duly proceeded to trial. The first trial, in Febrary
2020, resulted in a mistrial, with the jury unable to come to a unanimous
verdict even after a lengthy period of deliberation. A new trial was scheduled,
commencing on March 10, 2020. On March 16, 2020, an eleven person jury returned
a verdict of guilty shortly before the end of the day. Mr Bright filed a direct
appeal of the verdict, challenging various evidentiary decisions made during
the trial. This appeal was denied, with the denial becoming final on June
8, 2022.

### II.  Statement of Facts

Having overseen two trials already, the Court is familiar with the facts of
the case; to summarize, Mr Bright contacted an undercover FBI agent in 2019
on a dating app. Mr Bright was looking for kinky sex with consenting adults;
the undercover was offering sex with non-consenting minors. After Mr Bright

realized that he had misunderstood the officer's offer, he endeavoured to obtain unambiguous evidence of the officer's criminal plans. Accordingly, he arranged to meet the undercover--though not her minor children--and record her invitation to harm her children. It was at this meeting that he was arrested.

After his arrest, Ms Amy Gallicchio was appointed as Mr Bright's lawyer. From their very first meeting, Mr Bright intended to take the case to trial and protest his innocence. He went to trial in February, 2020, facing a single count of attempted enticement of a minor, 18 U.S.C. § 2422(b). The jury was given the case after a little over two days of evidence. Even though faced with only a single count of a single charge, a handful of witnesses, and less than three days of evidence, and ████████████████████████████████ ████████████████████████████████████████████even though they were read an Allen charge and given considerable time to deliberate, the jurors were unable to agree on a unanimous verdict. Accordingly, the jury was deemed to be hung, and a mistrial was declared.

A new trial was scheduled to start on March 10, 2020. The evidence and presentation was virtually identical to that of the first trial. The case was given to the jury on the afternoon of Friday, March 13, 2020. With no verdict reached that day, the jury was told to return to court on Monday morning to resume its deliberations. On that Monday, only eleven of the twelve jurors appeared. The twelfth juror had called in sick, stating that they thought they were infected, possibly with COVID-19, possibly with a run-of-the-mill norovirus. Over defence objections, the Court ordered that deliberations continue with an  eleven-person jury. As the end of the day approached, and the jury was faced with having to reach a verdict or be required to return the following day, a verdict of guilty was delivered. Only after the verdict was returned

did the Court inform the jurors that the absent juror did not, in fact, have a COVID-19 infection.

The defence team asked for a judgement notwithstanding the verdict or a new trial; these motions were denied. After several COVID-19-related delays, Mr Bright was sentenced in November to 144 months of imprisonment to be followed by seven years of supervised release. Both the sentence and term of supervision were longer than those asked for by the defence, and longer than that recommended in Mr Bright's PSR.

In his direct appeal of his conviction, Mr Bright challenged the submission of certain Twitter postings and private jokes, limitations placed on expert testimony, and the voir dire process used to select the jury. Though the appeals panel showed some sympathy to the Twitter argument (noting that none of the evidence submitted, nor anything that the FBI had found in its investigation, indicated that Mr Bright had ███████████ molested ███████████ minors) it nonetheless denied the appeal, finding no abuse of discretion had occurred.

The time for seeking review of this decision expired on June 8, 2022.

<u>JURISDICTION</u>

Pursuant to 28 U.S.C. § 2255, "[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, ... or is otherwise subject to collateral attack, may move the court which imposed sentence to vacate, set aside, or correct the sentence." Mr Bright so moves this Court on the grounds that his constitutional

right to a fair trial was violated, and, further, that he received ineffective
assistance of counsel both during and after this trial.


GROUND ONE FOR RELIEF

Mr Bright's constitutional right to a fair trial was abridged.

The word "unprecedented" is overused and misused, often used to describe events
that might be unusual, but are not so extraordinary as to be without precedent.
It is, however, an entirely appropriate adjective when used to describe the
COVID-19 pandemic and its resultant disruption. Since the virus reached American
shores in early 2019, it has claimed more than one million American lives,
caused thousands of businesses to shutter, and touched almost every part of
our lives. The disruptions to travel, both domestic and international, the
extended closure of schools and workplaces, the strict restrictions on gatherings,
and the constant exhortations to distance onself from others to stay safe
are all, in the most literal sense of the word, unprecedented.


Writing now, in mid-2022, in a time with widespread availability of effective
vaccines, and with the virus now mutated to be less deadly (though perhaps
easier to catch), it is easy to forget just how scary the early days of the
virus's spread were. In New York City, where Mr Bright was arrested, tried,
and convicted, the streets became piled high with garbage. Times Square was
abandoned. Dead bodies were stacking up so fast, and in such great numbers,
that they were being stored in refrigerated trucks. That mainstay of New York
life, the subway, cut back its operations amid trains and stations almost
empty. The state's governor, responding to overwhelmed hospitals, implored
New Yorkers to stay at home, and when this was not possible, to stay socially
distanced, in a desperate attempt to slow the spread of the disease and reduce

the demand for hospital beds in general, and ventilator-equipped ICU beds in particular.

Many recommendations came from the state and federal government on how best to stay safe. The most critical, the most effective, was to "socially distance" oneself. That is, to maintain a separation of six feet from anyone that was not part of one's household. The best way to do this was to stay indoors, at home, to as great an extent as possible. Time spent outside the home was to be minimal, and brief, sufficient only to perform some essential task. Large gatherings were strongly discouraged, with New York's bars, restaurants, theatres, and sports venues all closing their doors to prevent mass gatherings.

It is against this backdrop that Mr Bright's trial was conducted. Even at the trial's outset, COVID-19 had become a fixture on the evening news and a growing concern to the American people. Over the course of the trial, these concerns became  a crisis. The scale of this crisis was such that the jury was inevitably influenced, both distracted by the grave concerns about their health, their loved ones, their employment, the education of their children, and under enormous pressure to reach a verdict, any verdict, just so long as it allowed them to return to the safety of their homes. These combined influences served to deprive Mr Bright of his right to a fair trial, a right guaranteed by the Due Process clause of the Fifth Amendment.

A jury should not be required to literally risk its life in order to perform its duty. Jurors cannot be expected to remain conscientious, fair, and impartial when their very presence in the jury box and in the jury room constitutes a mortal risk. This is, however, the very situation that Mr Bright's jurors found themselves in.

While the circumstances surrounding Mr Bright's trial were unusual, indeed, unprecedented, the remedy is well-established. Courts have long recognized the risks of coerced verdicts. Traditionally, these risks arise from deadlocked juries; in US vs Byrski (1988), the Second Circuit Court of Appeals warned of the dangers of "the strong possibility that the jurors might be pressured to change their positions simply to reach  a unanimous verdict" and that the risk of a "coerced verdict" created the "manifest necessity for the declaration of a mistrial". In Byrski, the court was considering the effect of extended deliberations of a deadlocked jury; it is hard to imagine that the risk of death posed by COVID-19 would be any less coercive.

There appears to be little legal precedent for how a court should handle a pandemic such as the one that struck in 2020, because the pandemic itself is without precedent. However, a trial that occurred simultaneously with that of Mr Bright, a trial in the same district of the same circuit, conducted in the same court building, is instructive. United States vs Carl Andrews (19 Cr. 131 (PAE)) was being tried by Judge Engelmayer at the same time that Mr Bright was standing trial. The outcome of Andrews was, however, very different. On the morning of March 16, 2020, the Andrews jury was not present  and the trial was stayed. Some weeks later, a mistrial was declared.

The stay in Andrews came after an  (eventually) unopposed motion to stay the trial was made by the defence. That motion was filed initially on March 14, 2020, and argued that  continuing the trial posed a great health risk to all those involved, especially the jury, and that the environment would substantially prejudice the defendent.

To support this claim, the Andrews defence referenced the state of emergency

declared on Thursday, March 12 in the city, and nationwide on Friday, March
13. It highlighted the critical importance of "self-quarantine" to slow the
spread of the disease, the insufficiency of measures such as hand-washing,
and the lack of effective, timely testing capacity to determine if one was
an asymptomatic spreader. ██████████████████████████████████████████
██████████████ New trials in the Southern District were postponed, making
clear that the risks posed, both to health and to justice, were serious, and
recognized by the courts.

Initially, the government opposed the motion, arguing that the risks had been
adequately addressed by the limited measures that had been put in place to
enhance the cleaning of courtrooms and reduce the number of people present
in each court.

Andrews responded further, highlighting once again the importance of physical
separation--a measure that the order suspending new trials acknowledged--and
pointing to the suspension of trials in other states; ongoing trials in both
Washington state and California were suspended due to the dangers they posed.
Andrews asked Judge Engelmayer to give particular consideration to the impact
that COVID-19 would have on jury deliberations, imploring him to "imagine
the pressure on a hold-out juror to capitulate", and "imagine the atmosphere
in the jury room if there is dissent."

Subsequent to this response, the government withdrew its objection to the
motion. Accordingly, on the morning of Monday, March 16, 2020, Judge Engelmayer
granted the unopposed motion to stay the trial. His comments made when issuing
the stay are ██████ instructive, as they capture the fears and uncertainties
that were abundant at that time. Consistent with the advice given by infectious

disease experts at the time, he said that there was a "compelling public interest in permitting social spacing". He also stressed that there was no effective way to provide this for the jury; "arrangements could be made with respect to the lawyers to achieve spacing in court by moving this case to a larger courtroom, no such solution is really tenable for our 16-person jury".

The close proximity of the jurors to one another was inevitable, "even if the Court were to relocate the trial to th largest facilities in the courthouse", because the jurors would in any case be required to share a jury room and two jury bathrooms. They would also be exposed to contact with others "en route to and from the court".

Judge Engelmayer also acknowledged the risks of distraction, calling this a "grave risk", and expressing his "grave doubts" that a reasonable jury would not be "terribly distracted" by all that was happening at the time. He went further, saying that a jury would be "highly unlikely [...] to be deliberate and patient and methodical" and that as a result any verdict that jury delivered would be subject to "substantial challenge" on appeal.

Everything that was true in Andrews is true here. ████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████ The jurors were under immense pressure to come to a verdict, any verdict, whether carefully considered and supported by the evidence or otherwise, because that was the only way that they would be permitted to return to the relative safety of their homes, the only way to keep themselves and their families as safe as possible from COVID-19.

It is true that the trial in Andrews had not yet reached the same stage as Mr Bright's trial. In Andrews, the government still expected to offer another hour and a half of evidence; beyond that would be the defence's evidence, if any, closing arguments, and the reading of the jury instructions. However, this difference is not significant. It was specifically the threat faced to the jurors—their inevitable close proximity to one another, their shared jury room and restrooms, their contact with court personnel, their travel to and from the courthouse each day—that represented an unacceptable disease risk, and it is the effect on their deliberations that would render any potential judgement unsafe. That Mr Bright's trial had already reached the deliberation stage does nothing to reduce these concerns.

Furthermore, Mr Bright's jurors were given particular reason to be fearful for their own safety. One of their number did not appear on Monday, March 16 because he was concerned that he had already been infected with COVID-19. The absence of this juror, the empty seat that had once been occupied, would serve as a constant reminder of the extraordinary conditions and dangers that the jurors faced. That the juror was ultimately found not to be suffering from COVID-19 is of no importance; this information was only provided after the verdict had been delivered.

This is not to impugn the jurors. It would have required superhuman effort to remain focused and willing to take as long as necessary to fairly deliberate this case. What was implicitly being asked of them was more than should ever be demanded of a jury. It is the circumstances of the trial that precluded fairness, not any failure on the part of the jurors.

Inasmuch as these concerns should have been raised on direct appeal, the trial record is, unfortunately, inadequate. Although a mistrial was requested when news of the absent juror was announced, little justification or supporting material was entered into evidence to bolster this request. To the extent that this should have been done, the failure to do so represents Ineffective assistance of counsel. It is, however, the constitutional dimension that is principally being pressed at this juncture.

GROUND TWO FOR RELIEF

Mr Bright did not receive effective assistance of counsel during his trial.

## I. Legal Framework: The Strickland Standard

Claims of ineffective assistance of counsel in violation of the Sixth Amendment must satisfy the two-prong standard defined by the Supreme Court in Strickland vs Washington (1984): first, the petititioner must show that their attorney's performance was unreasonable under prevailing professional standards (the "performance prong"), and second, that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different (the "prejudice prong").

## II. Mr Bright received ineffective assistance of counsel during his second trial

A  Failure to pursue an entrapment defence

The defence of entrapment is a common feature of trials surrounding sting operations such as the one that Mr Bright found himself caught up in.  The Government is permitted to afford opportunities or facilities for the commission of an offence. It is not, however, permitted to originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal

act, and then induce the commission of the crime so that the government may
prosecute (Sorrells vs US). Should the government do this then the affirmative
defence of entrapment is available to the defendant.

The entrapment defence has two elements. The defendant must first show by
a preponderance of evidence that the government induced the criminal act.
The government must then prove beyond a reasonable doubt that the defendant
was predisposed to perform the act. The purpose of the predisposition element
is to "eliminate the entrapment defence for those defendants who would have
committed the crime anyway" (US vs Jacobson, dissent).

That the government induced the criminal act is clear. It was the government
that was advertising in the undercover agent's dating profile the opportunity
to perform illegal sex acts with minors; the undercover agent cajoled and
encouraged Mr Bright to harm the purported minors, and couched these acts
in terminology designed to make them appear virtuous, describing them as educational.
The government even all but conceded that Mr Bright was not even looking for
any criminal sexual activity; in closing argument the prosecutor acknowledged
that Mr Bright may have "mistakenly believed he was engaging in age play when
he first started talking with the mother". (Transcript, 568).

This acknowledgement also has significance for the predisposition element.
It concedes that Mr Bright was not seeking any kind of criminal activity,
but rather, legal role playing with consenting adults. This is important because
the inquiry into predisposition must demonstrate that the defendant was predisposed
to commit a criminal act "prior to first being approached by government agents"
(Jacobson). The government cannot use a defedant's "ready response" to solicitation

to demonstrate predisposition if that response comes only after the government's
actions to create that predisposition (Jacobson). In the Second Circuit, predisposition
may be shown by evidence of "(1) an existing course of criminal conduct similar
to the crime for which the defendant is charged, (2) an already formed design
on the part of the accused to commit the crime for which he is charged, or
(3) a willingness to commit the crime for which he is charged as evidenced
by the accused's ready response to the inducement" (US vs Brunshtein).

On all three points, the government's evidence is inadequate to prove predisposition
beyond a reasonable doubt. The government effectively conceded that Mr Bright
had no "already formed design" when it acknowledged that Mr Bright may indeed
have been looking for age-play when he initially contacted the undercover
agent. Mr Bright has no criminal history of any kind, nor has he ever even
been suspected of committing a crime, thereby eliminating the possibility
of any evidence of an "existing course of criminal conduct".

This leaves only the third type of evidence, Mr Bright's willingness, in question.
Evidence of willingness must show willingness prior to the government's inducement,
and here the government's case is, again, lacking. The concession that Mr
Bright may have been looking for age-play means that his initial conversations
with the undercover agent--the only conversations that can reasonably be said
to predate the government's encouragement to commit a crime--do not show any
willingness to commit a criminal act. Instead, they show a willingness to
have consensual sex with role-playing adults.

Even the later communications, in particular those after the undercover agent
sent Mr Bright the photographs of minors, show a lack of willingness from

Mr Bright. The government has made much of the swiftness of Mr Bright's response to one of the pictures. It has, however, ignored that many minutes elapsed before Mr Bright even acknowledged the sending of the picture ▓▓▓▓▓▓▓▓ of the male child; hardly what one would expect from an eager criminal. This response itself showed Mr Bright's reluctance and discomfort at the criminal act he was being invited to perform. In spite of his prior full and frank discussions of human anatomy and sex acts, Mr Bright became downright oblique and uncharacteristically coy when faced with the picture, using euphemism and allusion where before he had been explicit.

Further demonstration of Mr Bright's unwillingness came on the day of the meeting with the undercover agent. Although the undercover agent had previously told Mr Bright that the children would be in school until 3pm, Mr Bright endeavoured to meet the agent at 2pm, at a time that the children would not and could not be present. Moreover, he explicitly told the agent that he wanted to meet her alone, without the children being present. These are not the acts of someone eager and willing to commit a criminal act.

The question of entrapment was plainly one that should have been put to the jury. However, Ms Gallicchio did not request that the jury be given an entrapment instruction, and did not make mention of entrapment in argument. Ms Gallicchio and Mr Bright had discussed entrapment, but only in a cursory way. Critically, Mr Bright did not have a correct understanding of the entrapment defence. As described in his affidavit, Mr Bright believed that the use of the entrapment defence would require him to take the stand and "affirmatively state that [he] committed the crime that [he] was accused of, and that [he] only did so because of the government's inducement". Mr Bright was unwilling to do this because he did not want to commit perjury, and did not want to contradict

14

the substance of his statement to the FBI. Mr Bright asserts that he "made
clear [his] (faulty) understanding of an affirmative defence" and told Ms
Gallicchio explicitly that he "could not take the stand and affirm the elements
of the crime".

At no time did Ms Gallicchio explain to Mr Bright that his understanding of
criminal defences in general, and the affirmative defence of entrapment in
particular, was flawed. Specifically, she never explained that (1) inconsistent
defences are permitted (e.g. Johnson vs US (1970), Womack vs US (1964), Mathews
vs US (1988)), (2) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
that a defendant is entitled to jury instructions on any recognized defence
for which there exists evidence sufficient for a reasonable jury to find in
his favor (Stevenson vs US (1896)), (3) the affirmative defence of entrapment
may be offered even when a defendant offers an alibi (US vs Mathews (1988)).

Mr Bright attests that "had the true nature of the entrapment defence been
explained to [him] then he would have demanded that the jury be given an entrapment
instruction, and, further, have instructed Gallicchio to explain entrapment
in argument". Given the facts of the case--the government's clear inducement,
Mr Bright's lack of predisposition, the absence of any evidence of interest
in prepubescent minors--Mr Bright's assertion that he would have wanted an
entrapment defence to be offered if it had properly been explained to him,
is plainly credible. Entrapment is a common defence offered by those caught
up in sting operations, and the courts have permitted them to be offered even
with facts much more ambiguous than those here.

For example, in US vs Brand (2006), the defendant was allowed to offer, and
the jury was instructed on, the entrapment defence. This is in spite of the

the government offering a range of evidence to support its claim that Brand
was predisposed to commit criminal acts with minors: Brand had engaged in
several conversations with minors in which he attempted to meet, Brand was
meeting minors in a chatroom named "I love older men", and Brand was found
to possess child pornography and child erotica. In US vs Hinkel (2016), entrapment
was again argued and instructed, in spite of evidence of detailed drawings
of adults and minors engaged in sex acts.


B  Failure to object to prejudicial prosecutorial mischaracterizatioons.


The Constitution guarantees criminal defendants "a meaningful opportunity
to  present a complete defence" (Crane vs Kentucky, (1986)), and that opportunity
serves to constrain the behaviour of the prosecutor in some ways. Violation
of these constraints is misconduct that warrants remedial action. Prosecutors
are not allowed to misstate facts; they cannot assume prejudicial facts not
in  evidence; they cannot put words into the mouths of witnesses (US vs Berger).
The prosecutor in Mr Bright's case did all of these things.


The swiftest and best way to remedy such actions is to make an immediate objection;
this allows the Court to take corrective action, and, should the Court fail
to do so, preserves the issue for direct appeal. Unfortunately for Mr Bright,
Ms Gallicchio failed to do this on a number of occasions, prejudicing Mr Bright
by unfairly undermining his defence and improperly shifting the perceived
burden of evidence.


The problems started with the prosecutor's opening statement: "[T]he defendant
gave the FBI his cover story. He told the FBI that he was a journalist for
a technology wesbite and that he recorded the meeting." While it is true that

Mr Bright was working at the time as a journalist for a technology website, and that he was recording the meeting, these first of these facts was in no way part of Mr Bright's defence. At no time did he ever claim that the recording of the meeting was in any way related to his occupation. (Transcript, 19)

This juxtaposition mischaracterized Mr Bright's defence; it represents his defence as if he were claiming to be an investigative journalist working on a child exploitation story. This interpretation might appear to be uncharitable--perhaps the prosecutor inadvertently added the first, irrelevant, fact to the second, relevant, one as a slip of the tongue. But we can disabuse ourselves of our notion, because the prosecutor ███████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ made the implication explicit just moments later, when he said "[t]he editor-in-chief will testify that the defendant was not an investigative journalist. [...] [T]he defendant had never written about child exploitation, and would not have been allowed to write about that topic" (Transcript, 20).

The prosecutor subsequently called Kenneth Fisher, editor-in-chief of the website that employed Mr Bright, and asked him "If the defendant, Mr Bright, had wanted to write about child exploitation, would that have been outside of his usual domain?", "Would you have approved an article on Mr Bright on child exploitation?", "Are you familiar with the term 'investigative journalism'?", and finally, "Was Mr Bright an investigative journalist [...]?". Though there was one objection to one of these questions--the second, on the grounds of relevance--it was overruled. That these questions, like the opening statement, fundamentally misrepresented the defence was never raised (Transcript 287-290),

The prosecutor made other mischaracterizations that similarly shifted the burden of evidence by asking the jury to believe things that the defence had never even argued. In his summation, the prosecutor said that "[w]hen the defendant got caught, and the FBI asked why he didn't turn over the chats, he panicked, he said he forgot. [...] [H]ow could he possibly forget that he had 132 pages of incriminating chats? How could he possibly forget about all of his conversations with Princessmom, the mother? So he tried to cover it up again by telling you that he only pretended to forget." (Transcript 563)

Mr Bright did none of these things. He did not claim he forgot. He did not claim that he only pretended to forget. The government presented no evidence that Mr Bright claimed to forget, and no witness delivered testimony that Mr Bright claimed to forget. The prosecutor was saying, in effect, that to believe Mr Bright's testimony, they would have to believe ▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬ things that Mr Bright never even claimed.

The prosecutor also mischaracterized the nature of the expert testimony. "Now, the defence wants to make this trial into something it isn't about, to  frame it as if, if he is into kink, then he canot intend to have sex with minors." This is, again, a claim by the prosecutor that has no basis in the evidence of the trial. The argument being made by the defence was:

> Mr Bright cannot be inferred to want to have sex with minors solely
> on the basis of his interest in age-play.

This is a different argument than the one that the prosecutor claimed was made:

> Mr Bright has an interest in age-play, therefore he has no interest
> in sex with minors.

This latter argument is not one that the defence made. It is not one that

the defence implied. It is a fabrication on the part of the prosecutor that,
once again, unfairly shifted the burden of evidence (Transcript 601).

Prosecutors are not allowed to make "improper insinuations and assertions
calculated to mislead the jury" (Berger). Such misrepresentations are particularly
troublesome, because of the elevated position that a prosecutor holds. "The
United States Attorney is the representative not of an ordinary party to a
controversy, but of a sovereignty whose obligation to govern impartially is
as compelling as its obligation to govern at all; and whose interest, therefore,
in a criminal prosecution is not that it shall win a case, but that justice
shall be done. As such, he is in a peculiar and very definite sense the servant
of the law, the twofold aim of which is that guilty shall not escape or innocence
suffer. He may prosecute with earnestness and vigor--indeed, he should do
so. But while he may strike hard blows, he is not at liberty to strike foul
ones. It is as much his duty to refrain from improper methods calculated to
produce a wrongful conviction as it is to use every legitimate means to bring
about a just one. It is fair to say that the average jury, in a greater or
lesser degree, has confidence that these obligations, which so plainly rest
upon the prosecuting attorney, will be faithfully observed. Consequently,
improper suggestions, insinuations [...] are apt to carry much weight against
the accused when they should properly carry none" (Berger, emphasis added).

In US vs Ballard, the government improperly mischaracterized the defence's
position in summation, creating the same problem as here: it created the "suggestion
that, to acquit Ballard, the jury had to find that [the misrepresented argument
was true]". In Ballard, a single objection was made to this mischaracterization,
and a vague (and, apparently, misunderstood) response was given by the court.
The government then continued to mischaracterize, without further objection.

The appeal court held this to be a "serious" error, and the government conceded
that it was improper to mischaracterize the defence argument.


## III.   The performance prong

Ms Gallicchio's performance fell below the standard expected of defence counsel.
There are commonalities to the analysis of her performance (and, indeed, of
the prejudice prong), so to avoid repetition, both the failure to make an
entrapment defence, and failure to object to the improper statements from
the prosecutor will be handled together.


Under the Strickland standard, much deference is given to defence attorneys
under the remit of trial strategy. A strategy that might produce equivocal
evidence and thus is not pursued would not typically be Strickland error.
The errors in Mr Bright's case, however, go far beyond what would be reasonable
trial strategy. ████████████ There is no risk that the government might
have introduced damaging evidence to counteract an entrapment defence--the
government had already put its best possible predisposition evidence before
the jury--nor could it have done so for its misleading and improper arguments-
-it could not possibly have presented evidence that Mr Bright claimed to be
an investigative journalist, or that he claimed to have forgotten, or that
Mr Bright's expert was arguing impossibility, because these claims were all
claims that the prosecutor invented. There is no possible strategic advantage
in denying a jury additional bases on which to acquit; there is certainly
no  strategic advantage in allowing a prosecutor to shift the burden of evidence
and suggest to the jury that to acquit they must believe something that was
not even argued. These were not strategic decisions.


In the case of entrapment specifically, Ms Gallicchio's failures arguably

precluded any kind of strategic considerations in the first place; by failing to properly explain the true nature of the entrapment defence, Mr Bright was not put in a position to properly evaluate its merits. Had he been properly informed, he is unequivocal in his claim that he would have insisted that entrapment be put before the jury.

Moreover, these are not obscure elements of law. Once he finally had access to the prison law library, Mr Bright attests that he learned the true nature of the entrapment defence within a few hours. Even if Ms Gallicchio needed to brush up on entrapment prior to Mr Bright's trial, it would not have required any significant effort to learn what Mr Bright subsequently learned. That entrapment is a common feature of defences in cases similar to Mr Bright's again underscores her failure; this is not some unusual, off-the-wall legal theory, but a recurring theme in any government sting operation. Ms Gallicchio implicitly conceded as much when she told Mr Bright that this case was close to entrapment, the very thing that evinced Mr Bright's incorrect understanding of the defence.

These failures are especially telling given that Ms Gallicchio had forewarning of the government's case. In Mr Bright's first trial, the evidence presented and arguments made by the government were substantially identical. Two of the government's improper claims were made in that first trial—the investigative journalism theory, and the expert-arguing-impossibility claim. The total absence of any evidence of any sexual interest in, let alone criminal intentions towards, prepubescent minors was also clear from the first trial. The viability of an entrapment defence, and the improper mischaracterization of the defence by the prosecutor, were both known of before even stepping foot in the courtroom. That Ms Gallicchio did not take advantage of this rare opportunity is a plain

deficiency in her performance in Mr Bright's trial.

The magnitude of this error can perhaps be gauged from US vs Perez-Rodriguez (2021). That case concerned a similar sting to the one that Mr Bright found himself caught up in. As with Mr Bright's case, the facts lent themselves to an entrapment defence. In contrast, however, with Mr Bright's case, Perez-Rodriguez' lawyer did in fact ask for an entrapment instruction to be given to the jury. The judge in that case refused to issue the instruction. On appeal, this failure was deemed to be plain error: when the facts credibly make the case for entrapment, the appropriateness of the defence is so obvious that it is plain error to deny its use. If it is plain error on the part of a judge, it must surely be plain error on the part of a defence attorney. The facts in Mr Bright's case cry out for an entrapment defence. Were it not for Ms Gallicchio's deficient performance in advising her client, an entrapment defence would have been made.

███████████████████████████████ Equally, in Ballard, the court held that the mischaracterization by the government was so grave that the appeal coourt held that no curative instruction to the jury would have been sufficient to remedy the error. To allow such misleading arguments to stand unchallenged must be deficient performance on the part of Ms Gallicchio.

## IV.  The prejudice prong

If the case against Mr Bright had been "overwhelming" then the lack of entrapment defence and failure to object to the government's improper remarks might be overlookable; unfortunate, perhaps, but not so grave as to damage Mr Bright's

defence (US vs Rivera). That is not the case here. The evidence, and the presentation
of that evidence, was insufficient to prove Mr Bright's guilt beyond a reasonable
doubt in Mr Bright's first trial. Though they were instructed not to disclose
how they voted, the jurors in Mr Bright's first trial did in fact disclose
that they were split 7-5 in favour of conviction; as such, this was not a
case in which a lone holdout was, for whatever reason, refusing to agree
with their peers. Rather, the jury was clearly divided on the question of
Mr Bright's guilt.

This deadlock weighs heavily against any claim that the case was overwhelming
or that the errors were harmless. A hung jury "suggests that the case was
close" and the evidence "not so overwhelming that the outcome of the trial
was preordained" (Zappulla vs New York, 2004). "Thus, [...] a prior hung jury
may support a finding that an error committed with respect to a very close
issue during a retrial is not harmless" (US vs Newton, 2004).

The prejudice here takes two forms. The lack of entrapment defence meant that
jurors who might have been unconvinced of Mr Bright's alibi defence had no
alternative but to convict, even if they did not believe that Mr Bright ever
deliberately sought out a criminal sexual act, and even if they believed
that it was only due to the government's conduct that Mr Bright was guilty.

The mischaracterizations, due to their shifting of the burden, would be problematic
in any case. The nature of this case, however, makes them even more egregious.
The case hinged on Mr Bright's intent, and, thus, his credibility on the stand.
In misrepresenting the defence offered, the prosecutor called on the jury
to believe things that Mr Bright did not say, things that Mr Bright did not
believe, and, when claiming that Mr Bright "forgot" about the chat logs, things

████████████ that defied credibility. This unacceptably undermined

Mr Bright's credibility, and profoundly damaged his defence.

GROUND THREE FOR RELIEF

Mr Bright did not receive effective assistance of counsel after his trial.

I.  Legal framework: The Strickland Standard

As before, the same two prongs are necessary: unreasonable performance, and

a reasonable possibility that the result would have been different.

II. Mr Bright received ineffective assistance of counsel after his second

trial

In the months after the jury delivered its verdict, Mr Bright's

defence counsel moved for a judgement notwithstanding the verdict, or, in

the alternative, a new trial due to evidential insufficiency. This was done

in a proforma, perfunctory manner, relying only on the existing record. Mr

Bright's trial warranted something more than this effort, as there were significant

flaws with his conviction that warranted a more thorough treatment.


2422(b) is a charge that is designed to prohibit certain kinds of communication.

The charge does not require any attempt at the commission of a prohibited

sex act; the essence of the crime is attempting to obtain the minor's assent

(US vs Douglas, 2nd, 2010). That is to say, 2422(b) is intended to outlaw

the grooming of minors, not the commission of sex acts on them (which would

be covered by other statutes); an attempt under 2422(b) is, thus, an attempted

grooming, not an attempted prohibited sex act.

It is not disputed that this grooming can be performed through a third-party intermediary--typically a parent or guardian of the minor. However, this does not mean, or at least, should not mean, that any and all communication with an intermediary ipso facto constitutes an offense under 2422(b); there must nonetheless be some effort towards obtaining the minor's consent via that intermediary.

For example, in US vs Berk (2011), Michael Berk asked the father of a minor girl what the girl thought of the idea of renting her out for sex. In US vs Roman (2020), Richard Roman asked an undercover agent posing as the father of a minor girl, "Does she know about me yet?", and offered to buy candy for the girl to help "break the ice". Roman also expressed the intent to take the girl shopping to encourage her to engage in sexual conduct with him. In US vs Spurlock (2007), John Spurlock asked an ████████ undercover agent purporting to be the mother of two minor girls to  tell the girls about his wishes, and further asked the agent to tell the girls not to tell anyone what he planned to do to them. In US vs Howard (2014) in a bench trial, the presiding judge said that "[s]ending a picture of [Howard's] penis to [an] undercover officer and asking her to show it minors" constituted a substantial step towards an attempt under 2422(b). In US vs Lee (2010), Van Buren Lee sent an undercover officer purporting to be the mother of two minor girls a picture of his penis, and then asked if she had shown the girls the picture. He further stated that he wanted her to share the picture with them, adding "it's only fair for them to see what they may be getting". In a later conversation he told the agent to "[t]ell the girls I send my lov[e]".

The government offered, and the government had, no comparable evidence for Mr Bright. At no point did he ask the undercover agent to relay messages to

the purported minors, nor did he propose taking any actions (such as buying candy, flowers, clothing, or gifts) that might encourage in any way the minors. Although he sent some pictures to the undercover agent, he never directed the agent to show the pictures to the minors, and never expressed any desire that the minors see the pictures.

Mr Bright communicated exclusively with the purported mother. He did not attempt to influence her, because she was the one inviting him into her criminal abuse scheme. He did not attempt to influence the minors to engage in sexual acts with him; he did not even attempt to make the minors aware of his existence. Had the minors been real, Mr Bright's communication with their mother would have left their minds wholly untouched and unaltered. The agent here was not acting as an intermediary, because Mr Bright never intended or stated that she should act in such a way.

Even the meeting at which Mr Bright was arrested cannot represent an attempt to groom the minors. Mr Bright chose a meeting time that he knew the minors could not make, and, further, told the agent that he did not want the minors present ("I was hoping we might talk a little before they got home") (WhatsApp, 29, 129)

As such, the evidence to support element two of the attempted enticement of a minor charge is non-existent. The worst possible interpretation of the evidence is that Mr Bright was preparing to make an attempt at enticement, and that, had he not been arrested, he would have made some effort to use the mother as an intermediary to obtain the assent of her children. Mere preparation is not sufficient to sustain a charge of attempt.

The evidence was also insufficient to establish that Mr Bright intended to

engage in conduct for which anyone can face criminal charges. The underlying criminal charges at issue here are the various New York state charges of rape and sexual assault of a minor, in their various degrees. ▬▬▬▬▬▬ Even assuming that the evidence was sufficient to show that Mr Bright was trying to attain the assent of minors to engage in some activity, there is reasonable doubt that the activity in question would be sufficient to sustain criminal charges. ▬▬▬▬▬▬▬▬▬▬▬

This reasonable doubt was made explicit by the prosecutor in his summation. Mr Bright showed up to the meeting with "fresh Trojan Magnums. Extra large condoms. Not condoms that would fit him, but condoms that would be perfect for teaching children about how to use condoms, to show them how to put them on a vibrator" (at which  point Mr Bright's lawyer made an objection that was overruled), "... or banana or whatever else he wants to use" (Transcript, 604).

Such actions might be considered unusual, taking place outside the confines of a sex ed class. They might be considered to be in poor taste. But they would not be illegal under any of the New York statutes that were read to the jury. The concession that these actions were compatible with, indeed, in the prosecutor's view, suggested by, Mr Bright's actions means that there was incontrovertibly reasonable doubt about element three of the charge.

In addition to being a concession of reasonable doubt, the effect of the prosecutor's statement also opened the door to a conviction on an invalid basis. A juror might reasonably (albeit incorrectly) assume that such a lesson about condoms was criminal. After all, the prosecutor's job is to lay out the details of a crime. One would reasonably assume that the things the prosecutor is describing are in fact criminal--why else would he be talking about them? A juror might

agree that Mr Bright's intent was to put condoms onto vibrators or bananas. Accordingly, the juror might choose to convict. The prosecutor's statement invited this very error.

With the  dearth of evidence of any attempt to influence the minors (either directly, or through the mother), and the injection of reasonable doubt by the prosecutor himself, Mr Bright deserved a more fully-developed motion. In failing to draw attention to these flaws with the government's case, Mr Bright's counsel did him a disservice.

## III.  The performance prong

Again, there is no question here of strategic considerations. Presenting these arguments to the jury might raise such a concern--perhaps the evidential insufficiency is more nuanced and subtle than an attorney might wish to present to a lay audience--but in a motion written for a legal professional, there is no such worry. The omissions in the government's case--the lack of any evidence that Mr Bright wanted to influence the minors--are clear. So too is the acknowledgement of reasonable doubt bound up in the government's vibrator-or-banana theory. To fail to draw attention to these problems is to provide substandard representation.

## IV.  The prejudice prong

The prejudice to Mr Bright is plain; a conviction on an invalid basis, a conviction with the admission of reasonable doubt by the government, a conviction with no evidence of the crime alleged, cannot stand. He should have received a judgement of acquittal or, at the very least, a new trial. Allowing these flaws to stand unchallenged greatly prejudiced Mr Bright--it meant that he was declared guilty when he should not have been.

## REMEDY

Under § 2255, a court has a range of options available as remedies; it should "vacate and set the judgement aside" and then may "discharge the prisoner, or resentence him, or grant a new trial, or correct the sentence". In Mr Bright's case, the appropriate remedies are acquittal or a new sentence.

The first ground for relief warrants a new trial. Mr Bright deserves a trial in which the jury is not unduly pressured to come to a verdict, and is not unduly distracted from the case at hand.

The second ground for relief also warrants a new trial. Had the government's misrepresentations been pointed out during Mr Bright's second trial, it is likely that a mistrial would have been necessary: <u>Ballard</u> makes clear that errors of this magnitude cannot be corrected by an instruction from the bench. The entrapment question deserves to be put to a jury.

The third ground for relief justifies acquittal. The government, in summation, accused Mr Bright of attempting to engage in lawful behaviour, viz. showing how condoms work by putting them onto vibrators or bananas. This is not criminal. If the government believes that this is what Mr Bright intended--and that is what the prosecutor told the jury--then the government should not have brought Mr Bright's case to trial.



The impact of COVID-19 is so overwhelmingly obvious that it is hoped that an evidentiary hearing to establish the impact of the pandemic is not required.

The Andrews court made the case for a mistrial clear, and the government agreed at the time, neither opposing the motion to stay the trial, nor objecting to the comments made by Judge Engelmayer; it is not obvious that there is any basis for the government to disagree now. If, however, the Court feels it necessary to more precisely ascertain the impact that COVID-19 had on the jury's deliberations then an evidentiary hearing will be required. Rule 606(b) of the Federal Rules of Evidence allows jurors to testify about external influences on their deliberations. A deadly virus, the closure of schools, orders to stay at home and stay away from other people to as great an extent as possible unambiguously qualify as the kinds of external factors that 606(b) is intended to cover. Due to Mr Bright's incarceration, he is unable to ask the jurors about the impact that COVID-19 had himself; accordingly, he will require counsel to be appointed.

An evidentiary hearing is required for grounds two and three. § 2255 requires an evidentiary hearing whenever the movant has made "specific factual allegations that, if true, state a claim on which relief could be granted" (US vs Schaflander); if the Court accepts the truth of Mr Bright's allegations, as it must do at this stage, then it must conduct a hearing to consider all relevant evidence and make findings of fact.

In any event, Mr Bright requests that the Court appoint counsel, and, further, that his appointed counsel be granted leave to further brief these grounds, should it be necessary, to brief any new grounds that counsel discovers, and represent Mr Bright at any hearings that are required.

## CONCLUSION

For the foregoing reasons, Mr Bright respectfully requests that the Court grant his petition and vacate his conviction.

19th of September 2022

Respectfully submitted,

Peter Bright, pro se

CERTIFIED MAIL®

7022 0410 0000 2115 1914

⟨7 6309-054 ⟩
 位 M. P Kevin Castel
     Courtroom 11B
     500 Pearl ST
     United States Courthouse
     NEW YORK, NY 10007
     United States



Peter Bright 76309-054
FCI Petersburg Medium
Po Box 1000
Petersburg, VA 23804

LEGAL MAIL