Peter Bright vs United States 22-cv-8847 (PKC) [rel. 19-cr-0521 (PKC)]

<u>Motion for reconsideration of the denial of a § 2255 petition</u>

After two trials, Peter Bright was sentenced to 144 months of imprisonment and 7 years of supervised release for the crime of attempted enticement of a minor to perform any sexual activity that can be charged as a crime. Final denial of Bright's direct appeal came on June 8, 2022. A motion to vacate the judgement pursuant to 28 U.S.C. § 2255 was timely filed. This motion advanced four grounds for relief: 3 forms of ineffective assistance of counsel (IAC) and one claim of denial of a fair trial due to the impact of the Covid-19 pandemic. This motion was denied without an evidentiary hearing on December 13th, 2024.

Bright now moves for reconsideration of this denial. In denying Bright's motion, the District Court failed to respond to the grounds raised, failed to perform a necessary expansion of the record, and appears to have made an error of law. Reconsideration of the denial of Bright's petition is available under Rule 59 of the Federal Rules of Civil Procedure.

The Court's denial addressed Bright's grounds in an order other than that in which they were originally presented. For the sake of convenience, the Court's ordering will be used.

<u>Ground 1: IAC due to failure to offer an entrapment defense.</u>

To briefly summarize this ground:
1. Bright's attorney, Ms Amy Gallicchio, noted on several occasions of the relevance of the entrapment defense to Bright's case.
2. Bright told Gallicchio that he was not willing to testify that he had committed the crime, because this would be perjury and would contradict his entire statement to the FBI.
3. On this basis, Gallicchio did not make an entrapment argument. Critically important here is that Gallicchio did not make this decision on the basis of any strategic considerations, such as how it would play to the jury, how it would conform with the evidence, or how it might alter the government's case. It was made entirely on the basis of a legal consideration, namely that she could not suborn perjury by having Bright testify that he had committed the crime.

The problem here, and the reason that this represents a substandard performance by Gallicchio, is that her understanding of entrapment, and her perceived inability to use it, was incorrect, due to a misunderstanding of the law. More disturbingly, the Court's decision appears to endorse that same faulty understanding.

The mistake itself is straightforward and fundamental: entrapment can be argued even when an alibi defense denying the commission of the crime is presented. This was established unambiguously in Mathews vs United States, decided by the Supreme Court in 1988. In Mathews, the majority opinion specifically endorsed a situation in which "[Mathews] wished to testify that he had no intent to commit the crime, and have his attorney argue to the jury that if it concluded otherwise, then it should consider whether the intent was the result of government inducement".

In his concurring opinion, Justice Scalia even went so far as to explain why such an argument was not even inconsistent or contradictory. An inconsistency arose only if entrapment was defined as "(1) inordinate government inducement to commit a crime (2) directed at a person not predisposed to commit the crime, but also (3) causing the person to commit the crime." Scalia went on to say that he saw "no reason why the third element is essential".

Justice White's dissent objected to the decision on this very basis, writing with disapproval that "the Court holds that [Mathews] has the right to take the stand and claim [he did not do the crime] while having his attorney argue that he was entrapped into doing [it]."

The District Court appears to endorse the same mistaken view as Gallicchio when it approvingly quotes United States vs Balis (2009), in which Judge Lynch wrote that entrapment "in effect admits that the defendant engaged in the criminal conduct, and attempts to explain away the commission of criminal acts. Defense counsel tend to shy away from alternative arguments that dilute the force of a denial of wrongdoing."

As before, this viewpoint endorsed by the Court is not good law. No admission of wrongdoing is required--"in effect" or otherwise--and hence there is no need whatsoever to "dilute the force of a denial of wrongdoing."

The Mathews court was explicit that entrapment argued on a provisional, conditional basis was permitted--a defendant can indeed testify that he "had no intent to commit the crime, and have his attorney argue to the jury that if it concluded otherwise then it should consider whether the intent was the result of Government inducement."

A decision made on the basis of a mistake such as this cannot be regarded as a legitimate strategic decision. The Supreme Court explained this plainly in Hinton vs Alabama (2014), in which the majority wrote "[a]n attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under Strickland."

The assertion of IAC was justified by just such an ignorance of a point of law. This is not an attempt to use hindsight to try to justify a different strategic approach--there was no strategic decision at all. Only a legal one, based on a faulty understanding of entrapment. Unfortunately, this argument has been entirely ignored by both the government and the Court, both of which have advanced strategic arguments (such as considerations of how the government's case may have changed to combat an entrapment argument) in order to sustain a denial of the claim. Neither has even acknowledged that the legal argument has been made, much less that such legal misunderstandings are "quintessential" unreasonable performance. Strategic decisions simply cannot be made when an attorney does not even understand the nature of the options being chosen amongst.

The Court goes even further, advancing arguments that the government did not make, to further explain why Gallicchio's performance was strategically reasonable. The relevance of this is not immediately clear, given the erroneous basis for Gallicchio's decision, but even assuming, arguendo, that Gallicchio **did** make a strategic decision, the Court's speculative strategic justification is unconvincing.

Most obviously, there is no reason to believe that the arguments are in any way related to Gallicchio's own considerations. The government has offered, and the Court has heard, not a single piece of evidence of Gallicchio's strategic thinking.

This is in spite of the Second Circuit's guidance in Sparman vs Edwards (1998) that a "district court facing a question of consitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the assertxa-

ineffective attorney an opportunity to be heard and to present evidence in the form of live testimony, affidavits, or briefs."

It is not clear that it is appropriate for the Court to imagine the strategic arguments that Gallicchio **might** have offered **if** she had been asked. That aside, the imagined arguments are not as strong as the Court appears to believe.

First, as previously explained, the law is plain that to use entrapment Gallicchio would not have had to say anything or present any evidence that in any way undermined Bright's on-stand testimony and assertions of innocence. Any entrapment argument could have been conditional--"... even if you don't believe Bright's denial, this would be entrapment because..."--allowing it to cleanly coexist with Bright's denials.

Second, the Court's claim that an entrapment defense may have "backfired", by opening the door to further harmful evidence from the government in its bid to prove predisposition beyond a reasonable doubt is flawed: it is unsupported by the evidence offered at trial, it is unsupported by the government's own investigation into Bright, and it is unsupported by the government's opposition to Bright's petition.

The Court raises the spectre that, had entrapment been pursued, the government would have done two main things: (1) emphasized certain elements of Bright's conduct such as initiating the conversation with the Undercover Agent (UA); and (2) offered "further proof of predisposition".

As to the first, it is not obvious how such emphasis would only be made in response to an entrapment argument. In both of Bright's trials, the government **did** emphasize the very points that the Court now indicates. These points were uncontroversial and, in fact, wholly consistent with Bright's defense. What possible risk would the entrapment defense bring here, given these particular circumstances--the risk that the government would have made the very arguments that it already **did** make?

The same is true of the other purported risk, that "further proof of predisposition" would have been offered. The government trawled Bright's considerable digital footprint--tens of thousands of tweets, tens of thousands of message board

postings, thousands of e-mails, thousands of online conversations, hundreds of text messages--to present evidence under Rule 404(b). While 404(b) does not permit evidence for the purpose of showing character or propensity, it does, however, permit evidence for the purpose of demonstrating motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, and lack of accident. Propensity evidence is a slightly broader category than this, but only slightly, hence the Court's instruction to the jury that they not treat the 404(b) evidence as showing propensity: 404(b) evidence can often appear to be propensity evidence.

The government had considerable motive to dig up as much of this kind of evidence as it could. The fundamental question posed by the case is that of Bright's intent. The more circumstantial evidence of that intent the government could show, the better. This evidence would also potentially be useful to impeach Bright's testimony; he stated under oath that he was not attracted to minors, and prior evidence of such an attraction would have been useful to debunk this. And if the evidence were significant enough, it could even have been used to bring new charges against Bright.

Even with these strong motives in place, however, the government's showing was weak. The usual indicia of predisposition in cases such as this--possession of child pornography, other attempts to contact minors under the age of consent, prior convictions, collections of fiction describing sexual acts with children, participation in chat rooms or websites dedicated to the sharing of child pornography--were all absent in Bright's case. The government looked very hard for this kind of evidence, and it came up with nothing. There was nothing for it to find.

All the government did manage to find was a few tweets (largely concerned with young women in the netherworld between the age of consent (the relevant one here being that of the UK, 16, because that is where Bright was living at the time) and the age of majority (18)), and a couple of online conversations in which Bright made jokes--admittedly tasteless jokes--about sex with minors. In context, these jokes were plainly intended and received as humour, not genuine indications of sexual desire towards minors. And that little that the government did find was all submitted at trial.

There was no risk that the entrapment strategy could "backfire" by opening

the door to some damning new predisposition evidence. The government was already strongly induced to find and use such evidence, and it had very little to show for it. The opportunity to use such evidence already existed (to show intent, etc., to impeach Bright's testimony, and to bring new charges), and the government had already presented all that it could find. No further proof of predisposition would have been risked, because no further proof of predisposition existed. The government's response does not contradict this; the government has not offered even the merest hint of what further evidence it might have shown.

As such, the Court's claim that Gallicchio's performance was strategic is not supported by the facts of the case. The risks claimed by the Court—that arguing entrapment meant undermining Bright's denial, that it would have made the government emphasize evidence that it already emphasized, and that it would have provoked the government into offering evidence that it did not have and did not exist—are illusory. Even if it is assumed that Gallicchio's decision was strategic—which it was not—her failure to pursue the entrapment defense was unreasonable. Such a defense could only have benefits in Bright's case.

With the performance prong clearly established, focus turns to the prejudice prong. The Court's analysis of the prejudice prong is brief, and critically fails to consider how closely decided Bright's trial really was. This was not the typical display of overwhelming evidence; at Bright's first trial, a virtually identical presentation of virtually identical evidence resulted in a hung jury, with five of the jurors holding that the government had not proved its case beyond a reasonable doubt. Even small differences in argument and evidence are likely to have had a profound impact on the verdict.

The government conceded, in its closing argument, that the jurors might very well not believe that Bright had been seeking sex with minors in the first place. Jurors had to reconcile this with Bright's decision to meet with the UA. They also had to consider Bright's testimony; as was the case in <u>Mathews</u>, they might not have credited Bright's testimony about his intent. A verdict of entrapment offers the jurors a way to tie these things together—a way to decide the case that acknowledged the government's role in soliciting and encouraging the crime. Given the facts of the case, there is a very real possibility

that this option would have appealed to jurors, and a reasonable probability of a different outcome. This is sufficient to establish the performance prong under Strickland.

Ground 2: IAC due to failure to object.
This ground spanned several failures to properly object to arguments and questions made by the government.

The Court divided the first of these into two parts; because they are so closely intertwined, they will be treated here as one. To briefly summarize:
1. In its opening argument, the government claimed that Bright said that he was an investigative journalist.
2. Further, the government claimed that Bright attempted to use his identity as an investigative journalist to explain his decision to meet the UA: it said that Bright claimed to be investigating child exploitation for a story he was working on.
3. The government called a witness, Bright's employer and editor-in-chief, Kenneth Fisher.
4. The government asked Fisher if Bright had worked as an investigative journalist; Fisher testified that he had not.
5. The government asked Fisher if Bright would ever be assigned a story on child exploitation; Fisher testified that he would not.
6. In closing argument, the government reiterated its "investigative journalist" claim.
7. The government did not, at any time, offer any evidence that Bright did in fact claim to be an investigative journalist.
8. The government did not, at any time, offer any evidence that Bright claimed to be working on a story on child exploitation.
9. The government did not, at any time, offer any evidence that Bright attempted to justify meeting the UA by reference to his occupation in any way.
10. Gallicchio did not object to the government's claims in opening or closing arguments.
11. Gallicchio did not object to the government's decision to call Fisher to testify, nor to most of the questions that it asked him.

The Court's denial of this ground fails entirely to engage with the substance

8

of the complaint. In fact, it entirely misrepresents it:
> Bright contends that trial counsel was ineffective when she did not object to "prosecutorial mischaracterizations" when the government, in its opening statement, said that Bright told the FBI that he was a **journalist** for a technology website (emphasis added)

The Court further contends that Bright did "not dispute his statement to law enforcement, and any objection likely would have been futile". Further, the Court concludes that "questions asked about Bright's journalistic background were appropriate".

There is a substantial disconnect here between the ground for relief as argued, and that to which the Court apparently responded. The problem here is not that Gallicchio did not object to describing Bright as a mere **journalist**. It is that Gallicchio did not object to describing Bright as an **investigative** journalist and, moreover, an investigative journalist **claiming that he met the UA because he was writing a story about child exploitation.**

Yes, Bright claimed, accurately, to be a journalist. No, Bright did not claim, at any time, to be an investigative journalist, and nor did he claim at any time that he met the UA to develop a story on child exploitation. The government did not, and could not, offer any evidence that Bright said those things to the FBI, for the simple reason that he did not say them. The government misrepresented the kind of journalist that Bright claimed to be, and then outright lied about Bright's proffered explanation for meeting the UA.

The government then called Fisher as a witness specifically to debunk its own fiction, having Fisher testify that Bright was not an investigative journalist, and was not writing about child exploitation.

At no time, either to the FBI or in court, did Bright ever attempt to tie his occupation with the decision to meet the UA. The government's argument that he attempted to dishonestly use his occupation to defend the meeting is fabrication. It did not happen, which is why the government did not introduce any evidence to support the claim. Any inquiry into Bright's journalistic background was entirely irrelevant, because nothing in Bright's defense tied his background to his meeting with the UA. Accordingly, there was no basis at all to call Fisher as a witness. His sole contribution to the government's

case was to debunk claims that Bright did not even make.

To elide the distinction between a regular journalist and an investigative journalist is a misleading misstatement of the evidence. To claim that Bright in any way used his identity as a journalist to defend his actions is unambiguously wrong. As the Court even notes, in citing <u>United States vs Tocco</u>, "the prosecution and defense are generally entitled to wide latitude during closing arguments, so long as they **do not misstate the evidence**".(

A misstatement of the evidence--and an outright lie--are what Gallicchio failed to object to at trial. That the Court should mirror this same mistatement in its denial is more than a little concerning.

The effect on Bright's defense was significant. The defense, at its heart, was entirely predicated on Bright's intent. The evidence was substantially not contested (with the exception of the spin that the government tried to place on the 404(b) evidence). The basic facts of the meeting were not contested. The sole question for the jury was that of Bright's intent. It was critical that the jury believe Bright.

The government, however, claimed that Bright said things that were provably untrue, and then proceeded to call a witness to prove that they were indeed untrue. This plainly made Bright out to be a liar--and in particular, a person lying about his entire reason for meeting the UA; a person trying to cover up the true reason for his actions. But the lie here came from the government, not Bright.

Gallicchio allowed this lie to go unchallenged. She allowed the government to portray Bright as a person lying about his intentions, a person lying about the question that was the heart of the case. Maintaining Bright's credibility on the stand was essential to his case--Bright's testimony being the only direct evidence of his intent--and the government's actions allowed this credibility to be baselessly undermined and damaged. Gallicchio's failure to raise objections and correct the government's misrepresentations and dishonesty greatly undercut Bright's credibility.

The Court does not attempt to offer any strategic rationale for why Gallicchio might allow her client's credibility to be attacked in this way, and since the record has not been expanded to hear Gallicchio's side of the story, any such attempt would be purely conjectural.

The failure to object to misstatement and baseless dishonesty, and the decision to allow the government to unfairly attack Bright's credibility is plainly substandard performance sufficient to sustain the requirements of the performance prong. And the impact is hard to underestimate; in a case that hinges on the question of intent and credibility--a case that was closely decided, one in which small differences likely had large impacts--the prejudice prong is similarly satisfied.

The other failures to object were accurately presented by the Court, though reconsideration is still warranted for these, given that the Court's analysis does not appear to properly account for the closeness of the case in its assessment of prejudice.

Ground 3: IAC in the post-trial Rule 29 motion

To briefly summarize:
1. After the close of the government's evidence, Gallicchio made a motion for acquittal under Rule 29. This motion (obviously) did not reference any arguments made during the government's closing argument.
2. In its rebuttal argument, the government made the peculiar decision to advance a hypothesis of innocence, namely that Bright was meeting the UA to teach the (hypothetical) minors a lesson about condoms that involved putting condoms onto bananas to demonstrate how to use them correctly.
3. The government also argued that the condoms could not have been used for their more conventional purpose--as sexual prophylactics--as Bright would be unable to wear them. As such, the condoms were not circumstantial evidence of some desire to have safe sex with the minors.
4. After the verdict was delivered, Gallicchio renewed the Rule 29 motion, but did not draw any attention to the government's non-criminal "banana" theory.
5. The Court denied the renewed motion in a 9-page opinion that did not mention the government's hypothesis of innencence at all.

The original Rule 29 motion is not at issue here. It reasonably pointed out that the government did not offer any evidence that Bright attempted to communicate with the minors in any way, either directly or indirectly through the purported mother. No messages or pictures were to be conveyed, no presents to curry favour were to be bought, nothing was to be done whatsoever to influence the minors' behaviour--indeed, at no time did Bright even indicate that he wanted the minors to know of his existence, much less attain their acquiescence to some sex act.

At the close of the government's evidence, this was the right motion to make. That changed, however, when the government introduced its "banana" theory.

That the government is not required to address, much less debunk, every hypothesis of innocence from the defense is well understood. But this was not a hypothesis of innocence from the defense. It was one that came from the government. That source surely gives the hypothesis a different character entirely. The government not only told the jury that Bright met the UA with a non-criminal intent--putting condoms on bananas breaks no laws--it also told the jury that this legal purpose explained the presence of the condoms better than any inferred sexual purpose, because, it argued, the condoms could not have been used for their conventional sexual purpose.

There is no obvious way to square the government's simultaneous claims that (a)_ Bright intended to engage in behaviour that, while strange, was legal, but also (b) Bright was guilty beyond a reasonable doubt. The former immediately refutes the latter. The government's own theory of the case is that no illegal activity was intended. That is, in and of itself, an admission of reasonable doubt.

Gallicchio, however, failed to draw any attention to the government's extraordinary admission. The renewed Rule 29 motion did not mention it. Nor did the Court's decision denying that motion; the Court asserted that a reasonable jury could find guilt beyond a reasonable doubt, without even acknowledging that the government argued for Bright's innocent intent.

The prejudice is plain: an admissioon by the government that its own case has reasonable doubt and that, further, that this argument is a better fit

with the evidence than any hypothesis that the condoms were meant for a criminal purpose, must preclude any finding of guilt beyond a reasonable doubt. The consequence of the government's argument should have been Bright's outright acquittal; not highlighting this is clearly substandard performance that prejudiced Bright.

Even if Gallicchio did have some strategic reason for ignoring the "banana" theory, the Court has, again, heard no evidence to support that notion.

The Court's dependence on its reasoning in its 9-page decision on the renewed Rule 29 motion shares the same flaw as the motion itself; it does not consider the "banana" theory or grapple with its implications. To assert that the jurors had evidence to find guilt beyond a reasonable doubt even when the government was telling them that there was, in fact, reasonable doubt raises more questions than it answers.

Ground 4: The impact of Covid-19 on the jury's deliberations.
The ground is simple: the radical change in the Covid-19 situation over March 13th, 14th, and 15th, 2020, compromised the jury's ability to fairly deliberate on March 16th.

First, the Court states that this ground is procedurally defaulted because it should have been raised on direct appeal. To overcome that default, Bright must show cause as to why the default should be excused.

Bright stated in his petition and reply that the issue could not be raised on direct appeal because the record was insufficiently developed to sustain the argument. The Court says that this is inadequate to show cause, because Bright has not identified what further record developments would be needed.

But Bright has identified two different sets of record developments that would be needed. Pages 2 and 3 of his reply memorandum enumerate: "the New York State declaration of a state of emergency; the government advice that citizens stay at home, with their family unit, and avoiding mixing with strangers; and the closure of New York's schools".

The second kind of information is information from the jurors themselves:

when they learned about the government's recommendations; when they learned about them; what they understood about Covid-19 generally, and about the situation in New York City specifically; and what impact this information had on their willingness to come into court and deliberate. Bright, as an incarcerated individual, cannot determine this information himself, but the Court could enable it to be gathered by appointing counsel and giving permission under Rule 606 to identify the jurors, locate them and speak with them. This omission is within the Court's power to address, but it has elected not to appoint counsel or give this permission to fill the gap.

Contra the Court's claim, Bright has provided much more than "vague assertions" that the record needs augmenting. He has shown cause to excuse the default.

Should the Court continue to insist that Bright has failed to show cause, the issue in any case becomes one of ineffective assistance of appellate counsel (IAAC). Bright's appellate counsel agreed with Bright that Covid-19 was a worthy issue to raise, but, citing the lacking record, felt that it could not be raised on direct appeal. If, as the Court claims, there was no real insufficiency in the record then that appellate counsel, Daniel Habib, has neglected to raise a strong issue in favour of the weaker issues that he did raise. This would constitute ineffective assistance. To properly understand Habib's thinking, the Court would need testimony from him. As is the case with Gallicchio's thinking however, the record lacks any testimony from Habib, giving the Court no real basis to adjudicate the matter.

Either way, the Court claims that there is no evidence of prejudice. As mentioned previously, it has been impossible to obtain any direct, first-hand evidence from the jurors because the Court has not permitted Bright the means by which he might obtain such evidence. The Court mentions that the jurors did not raise any such concerns during the trial, but it neglects to mention that the jurors were never asked, either. Their silence on this matter is hardly unsurprising.

That no juror spontaneously told the Court of their concerns is hardly dispositive: the best option for a concerned juror would have been to come to a verdict, any verdict, and go home. Raising their concerns with the Court had a possibility

of improving the situation, certainly, as the Court could have immediately abandoned the trial on receiving such a concern. But this is far from guaranteed. The Court had already demonstrated a strong desire to stay the course with the trial when it chose to proceed with 11 jurors rather than granting a mistrial or seating an alternate. Telling the Court of concerns might have resulted in the jurors being marched back into the courtroom to be told to try not to worry and continue with their deliberations—thereby extending the proceedings— or even something far more disastrous, such as sequestration in a nearby hotel in order to protect the jurors from extended travel, prevent them from infecting their families, and keep them together as a unit, isolated from any potentially infected outsiders. Staying quiet, voting with the majority, and bringing deliberations to an end was the safest, most logical option.

In the alternative to any direct evidence, Bright depended heavily on Judge Engelmayer's statement when suspending <u>United States vs Andrews</u>, which was being tried simultaneously with Bright's trial in the same building. The Court has dismissed this largely out of hand, by pointing to the different posture of that case—in <u>Andrews</u> the case had not yet gone to the jury, and a decision was felt to be unlikely before March 19th.

The Court has been too hasty to dismiss Judge Engelmayer's reasoned and sober assessment of the Covid-19 situation as it stood on March 16th. While it is true that some of his concerns were not applicable to Bright's trial—for example, his fear that there might not even be 12 jurors when the time came for deliberations—others were entirely applicable. For example, as the Court itself noted, Judge Engelmayer said that there was a "grave risk" of jurors being distracted on the days leading up to the 19th. While distractions during deliberations are not the same as distractions during the evidence portion of the trial, it is not clear why this distracting environment, as conceded implicitly by the Court, should be any more acceptable during deliberations. Being distracted such that one misses a piece of evidence highlighted by another juror, or their explanation of their perceived view of that evidence is surely problematic. Bright deserves a jury that was not operating in such a distracting environment as existed on March 16th.

Judge Engelmayer also expressed concerns specifically about the impact that Covid-19 would have on his jury's deliberations, and it is not clear why—

and the Court gives us no reason why—these concerns would apply to one jury and not the other. For example, Judge Engelmayer was expressly concerned about the pressure that would be applied to any hold-out jurors to bring their decision in-line with that of their peers. This fear was based on the conditions found on March 16th, and there is no reason to believe that Bright's jury would be immune to it. The Court merely tells us that they would not feel any such pressure, or indeed be susceptible to any other negative influence from Covid-19.

This comes in spite of the Court's own, sua sponte, decision to relocate the final day of Bright's trial to a different courtroom that offered a larger jury room. Judge Engelmayer also contemplated such a move, though he felt that such a move would not be sufficient to provide a safe environment for the jurors to deliberate in. Clearly, on the morning of March 16th, the Court was concerned of the impact that Covid-19 might have on the jury, and wished to allay any fears that they might have had. Is it not feasible, is it not likely, that the jurors themselves had concerns about their safety? Or is the Court meaning to argue that any safety concerns were solely the domain of the Court, and that the jurors themselves would not care? If, as the Court now claims, there was not even a possibility that Covid-19 would weigh heavily on the minds of the jurors then why even move to a different courtroom? The Court's decision is not even consistent with its own actions. During the trial, Covid-19 was very obviously on everybody's mind—it was a scary time for the entire city—and the Court was responsive to those fears. Now it entirely rejects the possibility that the jurors might have had things on their minds that were a great deal more pressing than Bright's innocence or guilt. This defies belief, especially when considered cumulatively with the other grounds raised, in particular the unfair "investigative journalist" attack on Bright's credibility. The Court is respectfully requested to reconsider its denial of Bright's petition. The Court's current denial has not engaged with or addressed the substance of many of Bright's grounds for relief, and has not sought the testimony required to properly adjudicate IAC (and IAAC) claims. It is humbly requested that these oversights be addressed.

Respectfully submitted,

Peter Bright





76309-054
Pro Se Intake Unit
500 Pearl ST
Room 200
NEW YORK, NY 10007
United States



RECEIVED
PRO SE OFFICE
JAN 22 2025

